E-FILED
Wednesday, 20 May, 2026  04:42:24 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JGL, FRANCINE GOMEZ-LEE, and MARK A. LEE, <br><br> Plaintiffs, <br><br> v. <br><br> BRETT BOTTORFF, THE CHADDOCK SCHOOL, SUSAN HOLTSCLAW, GREGORY KELLETT, MADELINE STEWART, and FT. MADISON COMMUNITY SCHOOL DISTRICT, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 4:25-cv-04152-SLD-RLH |

## ORDER

In this case, Plaintiffs JGL, a minor, and his parents Francine Gomez-Lee and Mark A. Lee bring claims against six defendants, all stemming from the alleged sexual harassment and retaliatory treatment of JGL at school. Before the Court are the motion to dismiss brought by Defendant Ft. Madison Community School District ("FMCSD"), ECF No. 22, and the motion to dismiss, ECF No. 18, and motion for leave to file a reply, ECF No. 25, filed by Defendant Madeline Stewart. For the reasons that follow, FMCSD's motion to dismiss is GRANTED IN PART and DENIED IN PART. Stewart's motion for leave to reply is GRANTED and her motion to dismiss is GRANTED IN PART and DENIED IN PART.

1

## BACKGROUND[1]

JGL is a minor resident of Ft. Madison, Iowa, with an autism spectrum disorder and learning disabilities.  He is the son of Francine Gomez-Lee and Mark Lee.  At all relevant times, JGL had an Individualized Education Program ("IEP") under the Individuals with Disabilities Education Act ("IDEA").  In May 2023, at the end of JGL's eighth grade year, staff at FMCSD recommended that JGL's IEP involve a placement at The Chaddock School ("Chaddock"), a private Illinois-charted school operating special education programs, for his high school education.  After further discussions with FMCSD staff, Defendant Brett Bottorff (principal at Chaddock), and Chaddock Director of Education Corey Powell, JGL's IEP was finalized to involve attendance at The Chaddock School Carthage campus.

On August 22, 2023, JGL's first day at Chaddock, Stewart, a paraprofessional at Chaddock, rubbed and caressed JGL in a manner that was non-consensual and sexual in nature.  JGL recoiled and told her to stop.  From August 22 through October 27, 2023, JGL also observed Stewart engaging in inappropriate sexual contact with another male student ("Student X").  One such incident involved Stewart entering a room where JGL and Student X had been sent together.  Stewart instructed both boys to lie on the floor and proceed to rub Student X's back and upper thigh.  JGL attempted to intervene by blocking Stewart's hand, but she responded by striking JGL and verbally abusing him.  This conduct caused JGL severe emotional distress.  On or about September 19, 2023, JGL reported that he did "not want[] to be here anymore" during a counseling session.  Compl. 7, ECF No. 1.

---

[1] Unless otherwise stated, the facts described in this section are as alleged in Plaintiffs' complaint, ECF No. 1.  For the sake of ruling on the motions to dismiss, the Court "accept[s] as true all factual allegations in the . . . complaint and draw[s] all permissible inferences in [Plaintiffs'] favor."  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015).

On several occasions throughout this period, JGL reported Stewart's misconduct to Chaddock staff, including Bottorff and Defendant Susan Holtsclaw.  Lee and Gomez-Lee also reported concerns.  On or about September 7, 2023, JGL, Lee, and Gomez-Lee met with Bottorff and Holtsclaw to discuss regular calls from the school about JGL "acting out" and "not listening." *Id.* at 6.  During that meeting, JGL explained that his behavior was in relation to his objection to Stewart's inappropriate conduct.  Bottorf told Lee and Gomez-Lee that "there's nothing going on." *Id.*  JGL was disciplined almost daily for "acting out" and "not listening" in retaliation for his reporting and intervention concerning Stewart's misconduct. *Id.* at 7.  This discipline included removing JGL from instruction and confining him alone in a locked, windowless room.

In early October 2023, Stewart and Defendant Gregory Kellett worked together to prepare a sworn narrative to obtain a protective order against JGL.  In the petition, Stewart falsely accused JGL of threats and sexually suggestive remarks in order to deflect attention from her own misconduct.  After a protective order was issued on October 26, 2023, JGL was suspended from Chaddock.  As a result, Lee did not go to work so that he could care for JGL.  At no point before this did FMCSD ever follow up on JGL's placement or safety at Chaddock.  FMCSD finally held a meeting about the placement on November 7, 2023, after the protective order was issued.  It is unclear when or how FMCSD became aware of these events.

During this time, law enforcement received evidence of Stewart's misconduct, which included explicit communication, sexual touching, and oral sex with Student X.  The protective order against JGL was dismissed.  On or about November 29, 2023, Stewart was charged with multiple counts of child sexual abuse.  She pled guilty in September 2024.

3

In December 2023, JGL was withdrawn from Chaddock.  He continues to suffer significant trauma from these events.  Because of JGL's increased need for supervision, therapy, and care, Lee resigned from his job and Gomez-Lee decided to forgo a promotion, resulting in lost wages, benefits, and retirement contributions.

On August 22, 2025, JGL, Lee, and Gomez-Lee filed a complaint containing twelve counts against six defendants, including four against Stewart and four against FMCSD.  Against Stewart they bring Count V, seeking recovery under 42 U.S.C. § 1983 for the violation of JGL's Fourteenth Amendment right to bodily integrity; Count VII for sexual abuse, battery, and assault; Count IX for abuse of process and malicious prosecution; and Count XI for parental loss of society and services.  Stewart seeks dismissal of Counts V, IX, and XI for failure to state a claim. *See generally* Mem. Supp. Mot. Dismiss Stewart, ECF No. 19.  She contends (1) that Plaintiffs cannot prevail on their constitutional claim because Stewart is not a state actor, (2) that the complaint does not allege the necessary elements of abuse of process or malicious prosecution, and (3) that Plaintiffs' claim for parental loss of society cannot stand in Illinois because JGL did not suffer a fatal injury.  *Id.*  Plaintiffs filed a response opposing Stewart's motion in its entirety. *See generally* Resp. Mot. Dismiss Stewart, ECF No. 23.  Stewart seeks leave to file a reply to the response, as is required by Civil Local Rule 7.1(B)(3).  *See generally* Mot. Reply.

Plaintiffs bring four counts against FMCSD: Count II for disability discrimination in violation of § 504 of the Rehabilitation Act; Count IV for a violation of the IDEA based on FMCSD's failure to ensure a safe placement at Chaddock; Count VIII for a breach of FMCSD's duty to provide appropriate oversight and monitoring of JGL's placement; and Count XII seeking recovery for the economic loss suffered by Lee and Gomez-Lee.  FMCSD filed a motion seeking dismissal of Counts II and IV because the complaint does not allege disability

discrimination or violation of the IDEA, dismissal of Count VIII because FMCSD had no supervisory authority over Chaddock or its staff, and dismissal of Count XII because it cannot stand if the other counts are dismissed. *See generally* Mot. Dismiss FMCSD. Plaintiffs oppose the motion in its entirety. *See generally* Resp. Mot. Dismiss FMCSD, ECF No. 24.

## DISCUSSION

### I.    Stewart's Motion for Leave to Reply

Civil Local Rule 7.1(B)(3) states: "A reply to the response is only permitted with leave of Court." Circumstances justifying a reply include "the non-movant's introduction of new and unexpected issues in his response, and the interest of completeness." *Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 658 (C.D. Ill. 2023) (quotation marks and alteration omitted). However, "the Court does not typically permit the moving party to file a reply in order to introduce new arguments or evidence that could have been included in the motion itself, or to rehash the arguments made in the motion." *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011). Stewart claims that Plaintiffs' response merits a reply because it "advances legal and factual characterizations that warrant a reply to clarify the governing standards and to address discrete issues raised in opposition." Mot. Reply 2. Although Stewart does not identify specific reasons why a reply is appropriate, the Court finds her conclusion correct, particularly because Plaintiffs' response raises a reasonably unexpected choice-of-law question as an argument against dismissal, *see* Resp. Mot. Dismiss Stewart 7–8. As Plaintiffs' response introduces a new and unexpected issue, Stewart's motion for leave to reply is GRANTED.

## II.    Motions to Dismiss

### a.  Legal Standard

A court will dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To determine whether a complaint states a claim, a court considers whether a complaint's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. That is, a complaint must provide more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court conducting this review must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). However, a court does not accept a complaint's legal conclusions. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013).

### b.  Analysis

#### i.  Stewart's Motion to Dismiss

##### 1.  Count V: Substantive Due Process

Plaintiffs claim that "Stewart violated JGL's constitutional right to bodily integrity by subjecting him to unwelcome sexual touching and physical assault." Compl. 13. They seek recovery under 42 U.S.C. § 1983, which creates a cause of action for Constitutional violations by state officials acting under the color of state law. Stewart moves to dismiss this count because she is not a state actor for purposes of § 1983. Mem. Supp. Mot. Dismiss Stewart 3–6.

6

To succeed on a § 1983 claim, a plaintiff must establish that the defendant acted "under color of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010). This tracks the state action requirement of the Fourteenth Amendment. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes."); *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) ("The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the State?" (quotation marks omitted)). The state action requirement is satisfied if there is a "sufficiently close nexus between the State and the challenged action of the [private party] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974); *Brentwood Acad.*, 531 U.S. at 295. Several categories of circumstances qualify as a "close nexus," including when the challenged action "results from the State's exercise of 'coercive power,'" *Brentwood Acad.*, 531 U.S. at 296 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)), "when a private actor operates as a 'willful participant in joint activity with the State or its agents,'" *id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941(1982)); "when [a private entity] has been delegated a public function by the State," *id.* (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)), and "when [a private entity] is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control,'" *id.* (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)) (second alteration in original). *See Lugar*, 457 U.S. at 939 (describing "a number of different factors or tests" for purposes of identifying state action that the Court has articulated in different contexts).

7

Stewart asserts that Plaintiffs' allegations do not suggest that she was a state actor since she worked for Chaddock—a private school. Mem. Supp. Mot. Dismiss Stewart 4. Plaintiffs identify four allegations that they claim raise a plausible inference that Stewart's actions are attributable to the state:

> a. JGL attended Chaddock under an IDEA placement funded by a public school district.
> b. The public district remained responsible for ensuring educational access and monitoring placement.
> c. Stewart acted in her role as a paraprofessional within that publicly arranged special-education placement.
> d. After JGL repeatedly reported Stewart's misconduct, Stewart pursued Illinois court process (stalking no-contact order) that the school then relied upon to remove JGL from school.

Resp. Mot. Dismiss Stewart 3–4. Plaintiffs suggest that these facts show that Stewart was a "willful participant in joint activity with state officials" or that there was "pervasive entwinement" such that Stewart's actions are "fairly attributable to the State." *Id.* at 3. The Court finds that none of these allegations establish that Stewart was a state actor both because Chaddock itself was not a state actor with respect to JGL's IDEA placement and because Stewart was not otherwise engaged with any state officials when perpetrating any of the alleged misconduct.

Plaintiffs' allegations (a) through (c) essentially contend that Stewart was a state actor because she was Chaddock's agent with respect to its provision of education to JGL. The Court's analysis of this argument must begin with *Rendell-Baker*, in which the Supreme Court held that a similarly situated private school was not a state actor, 457 U.S. at 839–43. In that case, the majority of the private school's students were referred to it by public school committees or agencies after the students struggled to complete public high schools. *Id.* at 832. The private school even had a contract with a public school committee by which the school was required to

"carry out the individualized plan developed for each student referred to the school by the Committee." *Id.* at 833. Because of this system, the school's income "derived primarily from public sources" and it was "regulated by public authorities." *Id.* at 831. Nevertheless, the Court held that the school was not a state actor for purposes of its hiring and firing decisions because "the relationship between the school and its teachers and counselors [was] not changed because the State pa[id] the tuition of the students." *Id.* at 841. That holding controls here. There is no evidence that Chaddock's level of entanglement with state actors or policies is any greater than the school in *Rendell-Baker*, and there is no indication that the relevant actions of the school or Stewart were "changed because the State pa[id] the tuition of [JGL]." *Id.*

Courts have regularly held that *Rendell-Baker*'s holding is not limited to hiring and firing decisions; it also applies to § 1983 claims when the action at issue is the education of a student placed at the private school by a public agency. *See, e.g.*, *Donlow v. Garfield Park Acad.*, No. 09-6248 (MLC), 2010 WL 1630595, at *1–6 (D.N.J. Apr. 21, 2010) (finding a private school not a state actor with respect to misconduct including "plac[ing] [the plaintiff] into a windowless disciplinary room" despite the fact that the plaintiff was placed at the school by a public school district pursuant to an IEP); *Charnesky v. Shallenberger*, 06 C 50066, 2008 WL 11518032, at *7–8 (N.D. Ill. Feb. 13, 2008) (considering *Rendell-Baker* persuasive in concluding that a preschool that mistreated the plaintiff during the course of educational programming was not a state actor despite a cooperative preschool arrangement with a public school district); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 162—66 (3d Cir. 2001) (applying *Rendell-Baker* to allegations of physical and psychological abuse by school staff after the student's placement at the school by the Philadelphia Department of Human Services). As a result, a private school does not act under color of state law merely because a student is placed there pursuant to his IEP

9

and the school performs educational functions to satisfy the requirements of the IDEA. *See P.N. v. Greco*, 282 F. Supp. 2d 221, 238 (D.N.J. 2003) (holding that a school performing such functions "does not act under color of state law for the purposes of § 1983").

Plaintiffs rely on *Brentwood Academy* to argue that Chaddock was pervasively entwined with the state. Resp. Mot. Dismiss Stewart 3–4. The Supreme Court in *Brentwood Academy* considered "whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action when it enforces a rule against a member school." *Brentwood Acad.*, 531 U.S. at 290. It held that the association was a state actor, finding that the association was pervasively entwined with the state. *Id.* at 299–302. In that case, 84% of the association's membership was public schools, State Board members served as members of the Association's board of control and legislative council, the association's employees were eligible for membership in the state retirement system, and the association played the same role as it had in the past when it was expressly designated by the state as the regulator of interscholastic athletics in public schools. *Id.* at 299–301. The situation here is not analogous. There are no allegations that Chaddock enrolled any other students under a publicly-funded IDEA placement, that any state officials served in any capacity at Chaddock or made any decisions for it, that Chaddock employees received any benefits from the state such as the retirement benefits in *Brentwood Academy*, or that Chaddock was expressly designated by the state to perform a certain function for public schools or their students. *See generally* Compl.

The First Circuit has had opportunity to consider whether, under the logic of *Brentwood Academy*, a private high school that contracted with a public school district acted "under color of state law" when it suspended a student. *See generally Logiodice v. Trs. of Me. Cent. Inst.*, 296

10

F.3d 22 (1st Cir. 2002).  In that case, about 80% of the school's students were sponsored by the public school district, school district contributions made up roughly half of the school's budget, and the school's students were treated as public school students for purposes of extracurriculars, transfer of records, and assistance with registration.  *Id.* at 28.  However, the court still found that the school did not act under color of state law because it was not run by public officials and the action at issue—discipline of students—was exclusively within the purview of the school's trustees.  *Id.*  Like in *Logiodice*, the complaint here contains no facts to establish that Chaddock was operated by public officials or that the actions at issue were subject to state control.

No other state action theories make Chaddock a state actor.  There is no public function at issue, *see Rendell-Baker*, 457 U.S. at 842 (holding that education is not an exclusively public function); *accord Jackson*, 419 U.S. at 354 n.9, and Chaddock did not have a sufficient "symbiotic relationship" with the State since, on the face of the complaint, "the school's fiscal relationship with the State is not different from that of many contractors performing services for the government."  *Rendell-Baker*, 457 U.S. at 843.  Consequently, JGL's IDEA placement did not make Chaddock a state actor with respect to its education of JGL, so Stewart's role in that arrangement cannot make her a state actor either.  *See P.N.*, 282 F. Supp. 2d at 238 ("It is self-evident that [the agent of a private school] cannot have been acting under color of state law if [the school] was not.").

Even more damning for Plaintiffs' claim, what matters is not whether a private party is a state actor for all purposes, but whether *the specific action at issue* can be attributed to the state. *Lugar*, 457 U.S. at 937 ("Our cases have . . . insisted that *the conduct allegedly causing the deprivation of a federal right* be fairly attributable to the State." (emphasis added)).  In this case, Plaintiffs sue over Stewart's "unwelcome sexual touching and physical assault" of JGL.  Compl.

11

13.  Nearly all of Plaintiffs' arguments in favor of state action rely on Stewart's role in educating JGL at Chaddock and say nothing about the specific misconduct at issue.  *See* Resp. Mot. Dismiss Stewart 3–4.  The one additional line of reasoning—that Stewart made use of a state judicial process to obtain a protective order, *id.* at 4—does not change this conclusion since "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

For the same reason, Stewart was not a "willful participant in joint activity with the State or its agents." *Brentwood Acad.*, 531 U.S. at 296 (quotation marks omitted).  To satisfy the willful participation test, the private person must be "jointly engaged with state officials *in the challenged action*." *Dennis*, 449 U.S. at 27–28 (emphasis added).  Plaintiffs make no allegation that state officials had any role in the violation of JGL's right to bodily integrity itself.  There is no indication that state actors even knew about the alleged violation until November 7, 2023, *see* Compl. 8, after any alleged sexual misconduct ended, *see id.* (alleging that JGL was removed from Chaddock on or about October 30, 2023).  In short, Plaintiffs provide no reason to believe that Stewart's unwelcome sexual touching is fairly attributable to the state.  Count V is therefore DISMISSED as against Stewart because she was not a state actor.

### 2.  Count IX: Abuse of Process and Malicious Prosecution

Plaintiffs' abuse of process and malicious prosecution claims arise out of Stewart's pursuit of a protective order against JGL.  Compl. 15.  They allege that Stewart, with the assistance of Kellett, falsely accused JGL of threats and sexually suggestive remarks in order to obtain an *ex parte* order of protection, which an Illinois court issued on October 26, 2023.  *Id.* at 8.  After the issuance of this order, JGL was prevented from attending Chaddock.  *Id.*  Stewart

12

seeks dismissal on grounds that Plaintiffs do not plead the necessary elements of either malicious prosecution or abuse of process.  Mem. Supp. Mot. Dismiss Stewart 6–7.

### a.  Malicious Prosecution

In Illinois, plaintiffs must allege five things to state a claim for malicious prosecution: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (quotation marks omitted). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Id.*  In this case, Plaintiffs sufficiently plead each of these five elements.

First, Stewart commenced a civil judicial proceeding when she pursued a protective order against JGL.  *See Shea v. Winnebago Cnty. Sheriff's Dept.*, 746 F. App'x 541, 547 (7th Cir. 2018) ("[M]alicious prosecution in Illinois extends to *civil* proceedings such as requests for orders of protection." (citing *Howard v. Firmand*, 880 N.E.2d 1139, 1142–43 (Ill. App. Ct. 2007)).

Second, the proceeding was terminated in favor of JGL.  The favorable termination prong is satisfied only if the nature of the disposition "can give rise to an inference of lack of probable cause." *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1353 (Ill. 1997).  The form of the termination is not dispositive; it instead "depends upon the circumstances under which the proceedings are withdrawn." *Id.* at 1352 (quoting Restatement (Second) of Torts § 674 cmt. *j* (A.L.I. 1977)).  Here, Plaintiffs allege that the protective order was dismissed after law enforcement obtained evidence of improper sexual activity between Stewart and Student X and "Stewart admitted to sexual touching and oral sex with Student X."

Compl. 8.  Stewart suggests that it would be speculative to conclude that the dismissal suggests a lack of probable cause for pursuing the protective order and that Plaintiffs have not plead facts necessary to plausibly support an inference of lack of probable cause.  Reply Mot. Dismiss 4–5, ECF No. 25-1.  The Court disagrees.  Plaintiffs allege that JGL reported sexual misconduct against Stewart, that she sought a protective order by accusing JGL of threats and sexually suggestive remarks, and that the protective order was dismissed after Stewart's misconduct was proven, effectively showing that JGL's reports were accurate.  Compl. 8.  Though it is unclear on what authority the protective order was dismissed, at the motion to dismiss stage, it is reasonable to infer that the protective order was dismissed because the authorities believed that Stewart obtained it deceitfully in order to conceal her misconduct.  "Whether or not th[is] disposition[] ultimately [is] *proved by [P]laintiff[s]* to be indicative of a lack of probable cause remains a question of fact which cannot be answered at this stage of the litigation."  *Cult Awareness Network*, 685 N.E.2d at 1354 (emphasis in original).

Third, Plaintiffs sufficiently allege that Stewart lacked probable cause.  For an individual to have probable cause to seek a protective order, she must have an honest belief at the time of the action that a protective order was justified.  *Howard*, 880 N.E.2d at 1142.  Plaintiffs allege that Stewart "falsely accus[ed] [JGL] of threats and sexually suggestive remarks" and drafted language "designed to portray JGL as dangerous and to deflect attention from Stewart's misconduct."  Compl. 8.  They allege that the purpose was "to silence and discredit a reporting student, shift blame, and facilitate continuation or concealment of misconduct."  *Id.* at 15.  The allegations that Stewart lied to obtain a protective order for the sake of concealing her own misconduct are sufficient to plead a lack of probable cause.

14

Fourth, the allegations show that malice was present. This factor is established by showing that the person who initiated the proceeding was driven by improper motives. *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000). In this case, Plaintiffs allege that Stewart was motivated by a desire to discredit JGL, conceal her own misconduct, and deflect blame. Compl. 15. Such improper motive, if proven, would establish a presence of malice.

Finally, Plaintiffs have alleged damages. For a malicious prosecution claim to succeed, the damages must be "beyond the usual expense, time or annoyance in defending a lawsuit." *Cult Awareness Network*, 685 N.E.2d at 1350. Here, Plaintiffs allege that JGL was not allowed to attend Chaddock and was deprived of educational opportunities. *See* Compl. 8, 15. Such damages plainly go beyond the usual damages incurred in defending against legal action. Accordingly, the allegations in Plaintiffs' complaint establish all five elements of a malicious prosecution claim.

### b. Abuse of Process

"Abuse of process is defined as the misuse of legal process to accomplish some purpose outside the scope of the legal process itself." *Brian J. Wanca, J.D., P.C. v. Oppenheim*, 226 N.E.3d 732, 747 (Ill. App. Ct. 2023) (quotation marks omitted). To succeed on an abuse of process claim, Plaintiffs must prove most prove (1) an ulterior purpose in pursuing judicial action, and (2) an act in the use of legal process that is improper in the regular course of proceedings. *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004). "The elements are strictly construed, as the tort of abuse of process is not favored under Illinois law." *Id.* Stewart argues only that the second element is not satisfied. Mem. Supp. Mot. Dismiss Stewart 7; Reply Supp. Mot. Dismiss 5.

15

"In order to satisfy the second element, the plaintiff must show that the process was used to accomplish some result that is beyond the purview of the process." *Kumar*, 820 N.E.2d at 1173.  This means that "the defendant must have intended to use the action to accomplish some result which could not be accomplished through the suit itself" or that the defendant's use of process must have "compel[led] the party against whom it is used to do some collateral thing which he could not legally be compelled to do." *Doyle v. Shlensky*, 458 N.E.2d 1120, 1128 (Ill. App. Ct. 1983).

Two analogous cases are instructive.  In *Erlich v. Lopin-Erlich*, 553 N.E.2d 21, 22 (Ill. App. Ct. 1990), the defendants received an *ex parte* temporary restraining order ("TRO") blocking the plaintiff from disposing of marital assets during the course of marital dissolution proceedings.  The complaint alleged that the TRO was obtained "for the ulterior purpose of wreaking havoc with the plaintiff's ordinary business affairs and damaging the plaintiff's reputation for financial integrity." *Id.* (quotation marks omitted).  The court held that there was no abuse of process because a TRO may rightly be issued during a marital dissolution proceeding to prevent one spouse from disposing of marital assets. *Id.*  That is, even if the TRO was sought for an improper motive, its effect was within the typical scope of a TRO. *Id.*  "The fact that the representations made to the court were allegedly false does not alter our holding." *Id.*  Similarly, in *Ammons v. Jet Credit Sales, Inc.*, 181 N.E.2d 601, 604 (Ill. App. Ct. 1962), the court affirmed a dismissal of the plaintiff's claim that the defendant wrongly brought a garnishment demand that caused the plaintiff's employer to withhold her salary.  An abuse of process claim could not stand because "[t]he withholding of wages is the normal consequence of a demand in garnishment." *Id.*

Like in *Erlich* and *Ammons*, the alleged effect of the protective order in this case was not beyond the purview of the process. The removal of an individual from circumstances in which they can continue to harm another is the very purpose of a protective order. JGL's IDEA placement does not displace this conclusion since regulations promulgated pursuant to the IDEA empower schools to suspend special education students in certain circumstances. *See generally* 34 C.F.R. § 300.530. Even if JGL's removal from Chaddock did not comply with the requirements of the IDEA, the removal itself was within the purview of the protective order. In short, though Stewart may have attained JGL's removal from Chaddock for an improper reason, the protective order was not used to accomplish some result which is not typical of a protective order. Thus, Plaintiffs do not plead facts necessary to establish the elements of abuse of process.

Count IX is dismissed with respect to the abuse of process theory; it may proceed under a theory of malicious prosecution.

### 3.  Count XI: Loss of Parental Society

In Count XI, Plaintiffs seek recovery for deprivation of "society, companionship, and services of their minor child." Compl. 16. They allege that Stewart's actions caused a "loss of companionship, emotional distress associated with their child's injury, and disruption of family relations." *Id.* Stewart argues that Plaintiffs fail to state a claim for parental loss of society because Illinois law only provides such a cause of action if the child suffers fatal injuries. Mem. Supp. Mot. Dismiss Stewart 8. While Plaintiffs concede that "a parent cannot recover loss of a child's society for nonfatal injuries under Illinois common law," they instead suggest that this cause of action is cognizable under Iowa law, which the Court should apply based on Illinois choice-of-law principles. Resp. Mot. Dismiss Stewart 7–8. Stewart contends that this is

17

inappropriate because Plaintiffs may not amend their complaint through arguments presented in their brief. Reply Mot. Dismiss 5–6.

The parties are correct that Illinois common law does not allow parents to recover for loss of their child's society if the child does not suffer fatal injuries. *See Dralle v. Ruder*, 529 N.E.2d 209, 212–14 (Ill. 1988) (declining to extend recovery for loss of consortium to circumstances involving non-fatal injuries); *Vitro v. Mihelcic*, 806 N.E.2d 632, 640 (Ill. 2004) (reaffirming *Dralle*). However, before dismissing Count XI, the Court will consider Plaintiffs' choice-of-law argument. The Seventh Circuit has held that "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). And even before this rule was announced, plaintiffs were generally permitted to alter the legal theories asserted in their complaints as late as summary judgment briefing so long as doing so would not unduly prejudice opposing parties. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018). In the response here, Plaintiffs do not introduce any new factual assertions and Stewart does not suggest it would be unjust or prejudicial to consider their choice-of-law argument, *see* Reply Mot. Dismiss 5–7. In any case, considering a new legal theory at the motion to dismiss stage is appropriate since "a complaint need not plead legal theories," *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Thus, the Court proceeds to determine whether Illinois or Iowa law should govern Plaintiffs' loss of parental society claim.

Federal courts "appl[y] the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). Illinois uses the "most significant relationship" approach from the Second Restatement of Conflict of Laws. *Ingersoll v. Klein*, 262 N.E.2d 593, 596–97 (Ill. 1970);

18

*Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007).  Under this approach, courts begin by "isolating the issue and defining the conflict."  *Townsend*, 879 N.E.2d at 898.  Only if the laws conflict will the court make a choice-of-law determination.  *Id.*

In this case, the applicable Iowa and Illinois laws conflict.  Under Illinois law, parents cannot recover for loss of their child's society if the child does not suffer fatal injuries.  *Dralle*, 529 N.E.2d at 212–14.  In Iowa, however "[a] parent, or the parents, may sue for the expense and actual loss of services, companionship and society resulting from *injury to or death of* a minor child."  Iowa R. Civ. P. 1.206 (emphasis added); *see E.L.K. v. Rohlwing*, 760 F. Supp. 144, 148 (N.D. Iowa 1991) (denying motion to dismiss claim brought under Rule 1.206 predecessor for loss of filial consortium damages incurred because of a child's injury).  Because Iowa and Illinois law conflicts, the Court must make a choice-of-law determination.

The Second Restatement of Conflict of Laws contains a general set of considerations relevant to the choice of law:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (A.L.I. 1971).  The objective of this analysis is "to apply the law of the state that, with regard to the particular issue, has the most significant relationship with the parties and the dispute."  *Townsend*, 879 N.E.2d at 901 (quotation marks omitted); *see also* Restatement (Second) of Conflict of Laws § 145(1) (A.L.I. 1971) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.").

19

The Restatement also provides a set of "connecting factors" designed to apply the principles of § 6 to the type of case at issue. *Townsend*, 879 N.E.2d at 901. In torts cases, four types of contacts are to be taken: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (A.L.I. 1971). Finally, the restatement provides presumptions of what state's law applies in particular cases. Relevant here:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.[2]

*Id.* § 146.

Applying these principles from the restatement, a choice-of-law determination under Illinois law proceeds in two steps: "the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule, and (2) tests this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts)." *Townsend*, 879 N.E.2d at 903 (quotation marks omitted).

Pursuant to § 146, the presumptively applicable law is that of the state of the injury. For the purposes of a loss of consortium claim, this is generally considered the place of the family's domicile because that is primarily where the injury is "suffered and endured." *Jones v. State Farm Mut. Auto. Ins. Co.*, 682 N.E.2d 238, 249 (Ill. App. Ct. 1997). Here, that is Iowa. *See*

---

[2] The Restatement does not give a presumption specific to loss-of-consortium claims. Courts regularly consider them personal injury claims for the purposes of a choice-of-law analysis and apply § 146. *See, e.g., Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 496 (6th Cir. 2016); *Ambrose ex. rel. Ambrose v. Illinois-California Exp., Inc.*, 729 P.2d 331, 334–35 (Ariz. Ct. App. 1986); *Wright v. Minter*, 736 F. Supp. 1024, 1026 (W.D. Mo. 1990).

Compl. 3.  Under the considerations of § 6, as applied through the contacts listed in § 145, no other state has more significant connections since "[t]he simple fact of domicile indicates the jurisdiction's superior interest in having its laws applied in order to give effect to [its] tort policies."  *Jones*, 682 N.E.2d at 249 (applying Ohio law when an auto accident occurred in Illinois that caused a loss of consortium for an Ohio family).

This is consistent with the majority rule that the state of the family domicile is the state with the most significant relationship to loss of consortium claims.  *See, e.g.*, *Wright v. Minter*, 736 F. Supp. 1024, 1028 (W.D. Mo. 1990) (concluding that the majority view, that "the law of the family domicile governs a conflicts question in an action for loss of either spousal or parental consortium," is proper under § 146); *Ambrose ex. rel. Ambrose v. Ill.-Cal. Exp., Inc.*, 729 P.2d 331, 335 (Ariz. Ct. App. 1986) (reasoning that the state of domicile "has considerable interest in compensating its domiciliary plaintiffs"); *Avis Rent-A-Car Sys., Inc. v. Abrahantes*, 559 So.2d 1262, 1264 (Fla. Dist. Ct. App. 1990) ("Claims for loss of consortium are governed by the law of the state where the marriage is domiciled, rather than by the law of the state where the injury occurred."); *Felch v. Air Florida, Inc.*, 562 F. Supp. 383, 386 (D.D.C. 1983) ("[U]nder the District of Columbia choice of law rules, the law of the state of marital domicile rather than the law of the state where the wrong occurred should control a loss of consortium action." (citing *Linnell v. Sloan*, 636 F.2d 65 (4th Cir. 1980)).  *But see Casey v. Manson Const. & Eng'g Co.*, 428 P.2d 898, 907 (Or. 1967) (concluding that although Oregon was the state of the family's domicile, Washington had the most significant relationship to a spousal loss of consortium claim because the defendants were citizens of Washington and the underlying harm to the injured spouse happened in Washington).

It is, of course, easier to find that the state of the family's domicile has the most significant interest when the only connection with another state is that the underlying injury happened there. *See, e.g.*, *Ambrose*, 729 P.2d at 335 ("Arizona's connections with this case arise solely because the accident occurred on its portion of the interstate highways."). That is not the case here: JGL attended school in Illinois, most of the defendants worked in Illinois, and the underlying harm is alleged to be part of an extended series of wrongful acts, nearly all taking place in Illinois. But there remain significant contacts with Iowa: the plaintiffs are domiciled therein, FMCSD is an Iowa public school district, and JGL's placement at Chaddock was facilitated through FMCSD.

Illinois undoubtedly has a compelling interest in regulating the conduct that occurs within its borders, as effectuated by the application of Illinois law to the underlying torts in this case. But it has a significantly lesser interest in "maintaining the parent/child relationship" of Iowa residents, *Wright*, 736 F. Supp. at 1027, in the rights and responsibilities that are attendant to family status, *Avis*, 559 So.2d at 1264, and the rights of parents in Iowa to the "services, companionship and society" of their children, Iowa R. Civ. P. 1.206. As a result, Iowa law governs Plaintiffs' loss of consortium claim. Since Iowa law allows parents to recover for loss of society even if their child does not suffer fatal injuries, Stewart's motion to dismiss as to Count XI is DENIED.

### ii.   Ft. Madison Community School District's Motion to Dismiss

### 1.   Count II: Rehabilitation Act

In their first count against FMCSD, Plaintiffs claim that "[FMCSD] discriminated against JGL on the basis of disability by: (a) failing to provide reasonable modifications and accommodations to ensure his safety and access; (b) subjecting him to punitive and unlawful

22

seclusion; (c) responding with deliberate indifference to harassment that deprived him of meaningful access to education; and (d) retaliating against him for protected complaints." Compl. 11. They appear to advance both disability discrimination and retaliation claims under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Under this section, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). FMCSD seeks dismissal both because FMCSD had no notice of or control over the actions at issue and because the harm JGL suffered was unrelated to his disability and is therefore not actionable under the Rehabilitation Act. Mot. Dismiss FMCSD 2–4.

The Court first notes that it is unclear whether the Rehabilitation Act provides a cause of action for retaliation. *See Smith v. Mich. Dep't of Corr.*, 159 F.4th 1067, 1078–80 (6th Cir. 2025) (holding that the Retaliation Act's reference to the "standards" of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, only informs how claims are assessed and does not create a substantive claim for retaliation). The Seventh Circuit has never assessed the propriety of a retaliation claim under § 504, though it has long assumed that the Rehabilitation Act allows plaintiffs to bring retaliation claims, *see, e.g.*, *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 757–58 (7th Cir. 2006). The Court need not challenge this assumption because Plaintiffs do not state a claim for retaliation even if they can do so under § 504.

To state a claim for retaliation, Plaintiffs' complaint must establish that JGL engaged in statutorily protected activity. *See McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022). Reporting misconduct may be protected activity, but the reported misconduct "must be about the

23

[disability] discrimination." *Id.* at 871–72; *see also Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("A complaint of discrimination is a protected activity under Title VII only if the discrimination is based on a protected characteristic like race.").[3] "Merely complaining in general terms of harassment or discrimination, without specifying a connection to a protected class or providing facts to create such an inference, is insufficient." *McHale*, 41 F.4th at 872. Although JGL reported Stewart's sexual harassment of himself and Student X, Plaintiffs make no indication that JGL complained of harassment on the basis of disability or any other protected status. *See* Compl. 5–7. The retaliation claim therefore cannot stand as the reported misconduct was not about discrimination.

For similar reasons, Plaintiffs do not state a claim for disability discrimination. To prevail on their disability discrimination claim, Plaintiffs must prove that "but for" the disability, JGL would not have been excluded from participation in or denied the benefits of the educational programs. *Culp v. Caudill*, 140 F.4th 938, 943 (7th Cir. 2025); *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 989 (7th Cir. 2020). In this case, the complaint establishes only that JGL had a disability, Compl. 1, 3, that his placement at Chaddock was pursuant to an IEP created under the IDEA, *id.* at 2, 5, and that Chaddock administration knew about JGL's disability, *id.* at 5. But JGL's disability status alone does not convert unrelated harms to disability discrimination. The complaint nowhere alleges that the unwelcome sexual contact, the retaliatory treatment, the protective order, the removal from Chaddock, or any other of the alleged illegal conduct occurred because of JGL's disability. Since Plaintiffs' well-pleaded allegations do not establish that any of the mistreatment that JGL suffered was related to his disability, Count II is DISMISSED

---

[3] If actionable, retaliation under the Rehabilitation Act is subject to the same standard as retaliation under Title VII. *Burks*, 464 F.3d at 758 n.16.

## 2. Count IV: IDEA

In Count IV, Plaintiffs claim that FMCSD failed to fulfil its obligations under the IDEA.[4] Compl. 12–13.  FMCSD initially contends that dismissal is proper because it had no knowledge of the actions at issue or control over any of the relevant actors.  Mot. Dismiss FMCSD 2–3. This argument cannot succeed at this stage because, under the IDEA, school districts remain responsible for the provision of special education even when a student is placed in a private school.  The IDEA provides that in such cases, "the State educational agency shall determine whether [private] schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies."  20 U.S.C. § 1412(a)(10)(B)(ii).  While FMCSD is a local educational agency, not a state agency, regulations passed pursuant to the IDEA suggest that all local educational agencies also retain responsibility for the implementation of a child's IEP.  *See* 34 C.F.R. § 300.325(c) ("Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the [State educational agency].");  *see also id.* § 300.33 (defining "public agency" to include local educational agencies).  The Court is not aware of case law expounding on the contours of a public school district's liability when student's education at a private school does not comply with the IDEA, but FMCSD's motion does not engage at all with the District's continuing

---

[4] The IDEA contains a requirement that plaintiffs exhaust an administrative process before seeking judicial remedy. *See* 20 U.S.C. § 1415(*l*).  Plaintiffs suggest that the exhaustion requirement does not apply because they "seek compensatory damages under non-IDEA statutes."  Resp. Mot. Dismiss FMCSD 4.  The Court notes that the case Plaintiffs cite, *Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023), does not address how the exhaustion requirement applies to claims—such as Count IV—directly brought for a violation of the IDEA.  It instead states that the exhaustion requirement does not apply "where a plaintiff brings a suit under *another federal law* for compensatory damages—a form of relief everyone agrees IDEA does not provide."  *Id.* at 147–48 (emphasis added). Despite the Court's skepticism that the exhaustion requirement would not apply to this claim, which directly alleges a violation of the IDEA, the Court will not consider such an argument at this time since FMCSD has not argued that the exhaustion requirement bars Plaintiffs' IDEA claim, *see generally* Mot. Dismiss FMCSD.

responsibility under the IDEA, *see generally* Mot. Dismiss FMCSD, and thus has not convincingly shown that Count IV should be dismissed on these grounds. As a result, the Court proceeds to consider whether Plaintiffs' complaint states a claim for a violation of the IDEA.

The IDEA creates three relevant obligations of school districts towards students with disabilities. First, the IDEA's "core guarantee" is the provision of a free appropriate public education ("FAPE"). *Fry v. Napoleon Cmty Schs.*, 580 U.S. 154, 158 (2017); *see* 20 U.S.C. § 1412(a)(1). This means students with disabilities are entitled to education services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). Second, school districts must develop and implement an IEP for each student with a disability. *See id.* § 1412(a)(4). As the name suggests, IEPs are developed for and tailed to the needs of each student. *See generally id.* § 1414(d). Finally, students with disabilities are entitled to receive an education in the least restrictive environment ("LRE"). *See id.* § 1412(a)(5). This means that children with disabilities must be, "[t]o the maximum extent appropriate . . . educated with children who are not disabled" and that "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* § 1412(a)(5)(A).

Plaintiffs claim that "Defendants denied FAPE by failing to provide a safe educational environment, by allowing sexual harassment and abuse to occur, by isolating and secluding JGL contrary to law and his IEP, and by removing or restricting his access to education based on a false protective order." Compl. 12. FMCSD responds that the harm suffered by JGL was not

26

related to his disability and therefore is not actionable under the IDEA.[5]  Mot. Dismiss FMCSD 3–4.

The Court first considers whether the complaint states a claim for violating JGL's right to a FAPE.  Preliminarily, the right to a FAPE concerns educational provisions and programming; it does not create a freestanding right to be free of any inappropriate conduct.  *See Doe v. Dall. Indep. Sch. Dist.*, 941 F.3d 224, 227 (5th Cir. 2019) ("'FAPE' is a statutory term of art and is generally centered on a disabled student's access to adequate education by a school."); 34 C.F.R. §§ 300.101–113 (regulating, e.g., the use of assistive technology, the provision of extracurricular activities and fine arts, and access to extended school year services).

The Fifth Circuit's reasoning in *Doe* is instructive.  In that case, the court considered whether a claim based on a school's indifference to sexual assault of a disabled student by another student sought relief available under the IDEA.  *Doe*, 941 F.3d at 227.  The *Doe* plaintiffs brought claims under Title IX, 20 U.S.C. §§ 1681–1688, but the IDEA was relevant because it requires that plaintiffs exhaust a statutory hearing and appeal process before filing a civil action "seeking relief that is also available under this subchapter."  20 U.S.C. § 1415(*l*). The court held that the IDEA's exhaustion requirement did not bar the plaintiff's claim because "the gravamen of the complaint [was] not about the denial of a FAPE."  *Doe*, 941 F.3d at 228.

---

[5] FMCSD unhelpfully discusses Plaintiffs' IDEA claim together with their Rehabilitation Act claim.  *See* Mot. Dismiss FMCSD 3–4.  FMCSD then cites two cases about interpreting the Rehabilitation Act and Americans with Disabilities Act to support a general rule that the IDEA, along with these statutes, requires a plaintiff to "establish a threshold matter that the alleged discriminatory conduct of the Defendant was related to or caused by the disability." Mot. Dismiss FMCSD 3 (citing *Culp v. Caudill*, 140 F.4th 938, 943 (7th Cir. 2025); *A.J.T. ex rel. A.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025)).  While the ADA and Rehabilitation Act require a plaintiff to show "that but for the disability, he would have been able to access the services or benefits desired," *Culp*, 140 F.4th at 943, this has never been true of the IDEA.  Unlike the ADA and Rehabilitation Act, which prohibit discrimination against individuals with disabilities, *see* 29 U.S.C. § 794(a); 42 U.S.C. § 12132, the IDEA's "core guarantee" is the provision of a "free appropriate public education," *Fry*, 580 U.S. at 158 (quoting 20 U.S.C. § 1412(a)(1)(A)).  As a result, the IDEA is breached not when an individual is discriminated against on the basis of disability, but when an individual does not receive the IDEA's substantive and procedural guarantees related to the provision of education. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203–04 (1982) (describing the rights guaranteed by the IDEA's predecessor, the Education for All Handicapped Children Act).

"Were all traces of [the student's] disabilities removed, Doe's claim would look nearly identical to what exists now: allegations that the school was deliberately indifferent to [the student's] sexual abuse." *Id.*  The court considered two hypotheticals presented by the Supreme Court in *Fry*, another case on the IDEA's exhaustion requirement:

> "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?  And second, could an *adult* at the school—say, an employee or visitor— have pressed essentially the same grievance?"  If the answers are yes, then the claim is not likely about a FAPE since those hypotheticals take a claim away from the core purpose of the IDEA.

*Id.* at 229 (quoting *Fry*, 580 U.S. at 171).  The *Doe* court found it appropriate to add a third question in the same vein: "Could a student without disabilities bring th[e] same claim?" *Id.*  It ultimately found that the plaintiff's claim could have been brought by a non-disabled student, so "the gravamen of her complaint was not about the denial of a FAPE" and the IDEA's exhaustion requirement did not bar the suit. *Id.*  Unlike in *Fry* and *Doe*, the question here is not "whether a lawsuit in fact seeks relief available under the IDEA" but "whether any remedies are available under that law." *Fry*, 580 U.S. at 169 (quotation marks omitted).  However, these questions are instructive in determining whether Plaintiffs' claims are rooted in the denial of a FAPE.

Plaintiffs claim that FMCSD denied JGL a FAPE in four ways: "by failing to provide a safe educational environment, by allowing sexual harassment and abuse to occur, by isolating and secluding JGL contrary to law and his IEP, and by removing or restricting his access to education based on a false protective order." Compl. 12.  Some of these claims, such as the failure to prevent sexual harassment, could be brought by individuals at a different public facility or adults at the school.  However, claims regarding student discipline and suspension from school could not be brought by adults or rooted in conduct at non-educational public facilities.

28

And while non-disabled students could complain of wrongful discipline and suspension, that does not mean they could bring "essentially the same claim." *Fry*, 580 U.S. at 171.

The Department of Education has passed regulations implementing the IDEA that govern how schools are to discipline special education students. *See* 34 C.F.R. §§ 300.530–300.537. For instance, section 300.530(c) provides:

> For disciplinary changes in placement that would exceed 10 consecutive school days, if the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability pursuant to paragraph (e) of this section, school personnel may apply the relevant disciplinary procedures to children with disabilities in the same manner and for the same duration as the procedures would be applied to children without disabilities, except as provided in paragraph (d) of this section.

This section does not show that JGL's removal from Chaddock *per se* violated the IDEA, but it raises the possibility. If JGL's suspension exceeded ten days, then he was entitled to a determination of whether the behavior was a manifestation of JGL's disability, *see id.* § 300.530(e), and he was entitled to continue receiving certain services during his suspension, *see id.* § 300.530(d). These claims satisfy *Fry*'s litmus test since JGL's claims flowing from IDEA regulations could not be brought by any student regardless of disability status. Admittedly, the factual allegations in Plaintiffs' complaint that would be relevant to this claim are scant. The complaint does not state how long JGL's removal from Chaddock lasted, and it does not address whether he received a manifestation determination or continued educational services during the suspension. *See generally* Compl. However, the complaint does allege that JGL was removed from Chaddock and that he lost educational services as a result. *Id.* at 12. Though sparse, the allegations are enough to "allow[] the court to draw the reasonable inference that [FMCSD] is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

29

The complaint also plausibly alleges a failure to comply with JGL's IEP. It specifically alleges that Chaddock staff "removed JGL from instruction and confined him alone in a separate room without windows, with a door that locked or otherwise secured such that he could not leave, for periods of time that ranged from 20 to 60 minutes to the remainder of the school day, on at least ten occasions." Compl. 7. It further states that this isolation and seclusion "was not authorized by JGL's IEP." *Id.* Additional details about the requirements of JGL's IEP would be necessary for Plaintiffs to ultimately prevail, but these allegations are sufficient to plausibly state a claim for the violation of JGL's IEP.

On the whole, while the complaint does not indisputably establish a violation of the IDEA, FMCSD's cursory argument that the harm JGL suffered was unrelated to his disability cannot stand in the face of the extensive regulations governing discipline of special education students and the requirement that JGL receive an education in compliance with his IEP. Accordingly, FMCSD's motion to dismiss Count IV is DENIED.

### 3. Count VIII: Negligent or Willful and Wanton Hiring, Retention, or Supervision

Plaintiffs next claim that FMCSD breached its duty to ensure that Chaddock provided a FAPE, "including appropriate oversight, monitoring, and response to parent complaints and safety concerns." Compl. 14–15. They argue that "[FMCSD] breached these duties by failing to monitor adequately, investigate, or intervene despite notice." *Id.* at 15. FMCSD maintains that there are no factual allegations suggesting that it had any authority or control over Stewart or any other Chaddock staff. Mot. Dismiss FMCSD 4.

There are three elements of negligent supervision in Illinois: "(1) the defendant had a duty to supervise the harming party, (2) the defendant negligently supervised the harming party, and (3) such negligence proximately caused the plaintiff's injuries." *Doe v. Coe*, 135 N.E.3d 1,

30

15–16 (Ill. 2019) (quotation marks omitted).  FMCSD essentially argues that they have no duty to supervise Stewart or any other Chaddock staff.  The only duty that Plaintiffs point to, and the only one of which the Court is aware, is FMCSD's duty under the IDEA to provide a FAPE.[6]  Compl. 14–15.

As discussed above, the IDEA's implementing regulations anticipate that public school districts retain some responsibility to ensure children placed at private schools receive the rights guaranteed them by the IDEA.  *See* 34 C.F.R. § 300.325 ("Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the [State Educational Agency].");  *see also Derrick ex. rel. Tina v. Glen Mills Schs.*, No. 19-1541, 2019 WL 7019633, at *16 (E.D. Pa. Dec. 19, 2019) ("Although under the IDEA children with disabilities may be placed in a private school or facility as a means of providing special education and related services, ultimate responsibility for the appropriate provision of such services remains with the state or local education agency.").  Further, the IDEA provides rights specific to student discipline.  *See supra* pt. II(b)(ii)(2).

Based on the IDEA's statutory and regulatory structure, it is reasonable to infer that FMCSD had a duty to provide some oversight, at least as necessary to ensure JGL received the rights guaranteed by the IDEA.  In this light, FMCSD cannot defeat a negligent supervision claim by arguing that FMCSD had no control over staff at Chaddock.  *See* Mot. Dismiss FMCSD 4.  In fact, the lack of practical mechanisms guaranteeing that JGL received his rights under the IDEA could indicate that FMCSD breached its duty to ensure JGL's rights were not violated.

---

[6] Plaintiffs suggest that there may be additional "contractual, practical, or legal mechanisms to require staff safeguards and corrective measures." Resp. Mot. Dismiss FMCSD 5.  But there are no facts alleged in the complaint to support a plausible conclusion that a duty rooted in any other source exists.

31

It is worth highlighting the narrowness of this holding.  The Court does not suggest that FMCSD in fact breached its duty, nor does it address the contours of FMCSD's duty to ensure compliance with the IDEA at private schools.  It holds only that the IDEA and its regulations anticipate that public school districts have a continuing responsibility to guarantee compliance with the IDEA.  As a result, FMCSD cannot defeat a negligence claim with what amounts to an argument that it had no duty whatsoever to oversee JGL's IDEA placement.  On this basis, FMCSD's motion to dismiss Count VIII is DENIED.

### 4.  Count XII: Parental Economic Loss

Finally, Plaintiffs Gomez-Lee and Lee seek compensation for the economic loss related to (1) Lee's resignation from his job to supervise JGL and the related loss of wages and benefits, (2) Gomez-Lee's lost income from her declined promotion, and (3) out-of-pocket transportation, counseling, and tutoring costs.  Compl. 16–17.  FMCSD appears to agree that such recovery would be available but seeks dismissal because no other counts survive and recovery is only available if the cost was caused by a tort against the minor.  Mot. Dismiss FMCSD 4.  Plaintiffs respond, "[t]hat is not a basis for dismissal where Plaintiffs have plausibly pled underlying statutory and duty-based claims."  Resp. Mot. Dismiss FMCSD 5.  Because several of Plaintiffs' claims against FMCSD survive the motion to dismiss, FMCSD's argument cannot succeed.  As a result, FMCSD's motion to dismiss Count XII is DENIED.

### CONCLUSION

Accordingly, Defendant Ft. Madison Community School District's motion to dismiss, ECF No. 22, is GRANTED IN PART and DENIED IN PART.  Count II is DISMISSED as against Ft. Madison Community School District, while Counts IV, VIII, and XII survive. Defendant Madeline Stewart's motion to dismiss, ECF No. 18, is GRANTED IN PART and

DENIED IN PART. With respect to Stewart, Count V is DISMISSED, as is Count IX as it relates to abuse of process. The remaining counts against Stewart survive. Plaintiffs JGL, Francine Gomez-Lee, and Mark Lee are granted leave to file an amended complaint, if they so desire, within fourteen days of the entry of this Order. Stewart's motion for leave to reply, ECF No. 25, is GRANTED. The Clerk is directed to file the Reply, ECF No. 25-1, on the docket.

Entered this 20th day of May, 2026.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE